# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### DELTA DIVISION

**MICHAEL STARNES**                                                       **MOVANT**

**v.**                                             **No. 2:02CR95-MPM**

**UNITED STATES OF AMERICA**                               **RESPONDENT**

## MEMORANDUM OPINION

This matter comes before the court on the motion of Michael Starnes to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. The government has responded to the motion, and the matter is ripe for resolution. For the reasons set forth below, the instant motion to vacate, set aside, or correct sentence will be denied.

### Procedural Posture

On September 8, 2003, a jury convicted Michael Starnes of all ten counts of a superseding indictment charging him with six drug distribution and four firearm related offenses. (Appeal Vol. 14, pp.3-6). After being convicted on all counts, Starnes moved for a JNOV and a new trial; however, both requests were denied. *Id.* The Probation Service conducted a pre-sentence investigation and determined Starnes' base offense level to be 43 and his criminal history category II, which called for a Guideline range of 100 years for 7 of the charges – and an additional minimum of 45 years for the three 924(c) offenses (for drug-related firearms offenses). Application of the Sentencing Guidelines thus yielded a sentence of 145 years imprisonment. (Vol. 14, pp. 18-19). The maximum Guideline sentence available to the court was three consecutive life sentences plus 100 years imprisonment. Id. At his original sentencing, Starnes objected among other things, to the drug quantity used to establish his base offense level and the district court overruled his objections. (Vol. 14, p. 12). The court sentenced Starnes to 145 years imprisonment, the lower end of the Guideline range. (Vol. 14, p. 19).

Starnes appealed his sentence, arguing that his case should be remanded for sentencing in accordance with *United States v. Booker*, 543 U.S. 220 (2005). Starnes' original sentencing had taken place before the Supreme Court issued its decision in *Booker*, which rendered the United States Sentencing Guidelines advisory. Starnes further argued that he should not be held accountable for possessing the machine gun (count four) and that the three 924(c) counts were impermissibly tied to the same drug offense and constituted a violation of the prohibition against double jeopardy. Starnes also argued that the length of his pretrial detention was unconstitutional and argued Assistant United States Attorney Charlie Spillers should have been disqualified from the case. The government conceded the double jeopardy issue and recommended dismissal of two of the 924(c) counts – and that because of *Booker*, the case should be remanded for re-sentencing under the newly-advisory guidelines. The United States contested Starnes' other issues.

The Fifth Circuit agreed with the government, vacated Starnes' sentences, and remanded the case to the district court for re-sentencing with instructions to dismiss two of the three 924(c) counts. *United States v. Starnes*, 157 Fed. Appx. 687 *cert. denied*, 127 S. Ct. 1922 (2007) (unpublished). The Fifth Circuit ordered that Starnes be re-sentenced under the remaining 924(c) count and upheld the convictions and judgment of the district court in all other respects. *Starnes* at 696.

On September 7, 2007, the district court re-sentenced Starnes, who again objected to the drug quantity used to calculate his base offense level. Citing the mandate rule and the case of *United States v. Pinero*, 470 F.3d 200 (5th Cir. 2006), the district court declined to revisit the drug quantities used to determine Starnes' original sentence. (Supplemental Record on Appeal, Vol. 2, p. 5-6). The district court calculated Starnes' new guideline range at 130 years based upon the same underlying facts from

the original sentencing, but for the two dismissed firearms charges. (Supplemental Record on Appeal, Vol. 2, p. 59). Under *Booker*, the Federal Sentencing Guidelines had become advisory, not mandatory, and the court used the Fifth Circuit's instruction on the 924(c) counts to resentence Starnes to a total of 50 years imprisonment. *Id.* At 60. The court applied the 30 year mandatory sentence for Count 5 (the machine-gun charge) in accordance with 18 U.S.C. § 924(c)(1)(B)(2) and imposed a sentence of 20 years for the remaining charges to reach the 50 year total sentence. (Supplemental Record on Appeal, Vol. 2, p. 61). Starnes then appealed the new sentence of 50 years to the Fifth Circuit Court of Appeals. *United States v. Starnes*, 2010 WL 3049635 (5th Cir.) The Fifth Circuit lowered Starnes' sentence on three of the charges because the court, through a scrivener's error, had imposed a sentence greater than the statutory maximum on those charges. The Fifth Circuit otherwise affirmed Starnes' sentence, and the correction did not change Starnes' overall term of incarceration, which remained 50 years.

Starnes then filed the instant motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. In the instant motion, Starnes sets forth the following claims for relief:

(a) Counsel failed to object at sentencing to the 30 year sentence the court imposed for Count Five.

(b) Counsel failed to object to the four-level enhancement Starnes received for his role in the offense and failed to raise the issue on appeal.

(c) Counsel failed to object to the two-level enhancement Starnes received at sentencing for obstruction of justice.

(d) Counsel failed to object to the court's decision to categorize Starnes' 2 prior marijuana convictions as previous offenses for determining offense lever, rather than relevant conduct, during sentencing.

(e) Counsel failed to interview and call several witnesses Starnes wished to present during

trial.

(f) Counsel failed to challenge the amount of drugs attributed to Starnes as relevant conduct as set forth in the Presentence Investigation Report.

(g) Counsel failed to object to the government's decision to charge separate counts of conspiracy – one for marijuana and one for cocaine.

As discussed below, none of these claims has merit.

## Evidence Introduced at Trial

Starnes was convicted of all ten counts of a superseding indictment charging him with six drug distribution and four firearm-related offenses. On direct appeal the government conceded that two of the firearm-related offenses should be dismissed, and the court dismissed those charges on remand. The trial evidence proved that the Unknown Vice Lords street gang ("UVL") conducted a drug distribution operation at 630 Lincoln Place in Clarksdale, Mississippi, from on or about October 2001 through on or about June 12, 2002. As charged in Count Two of the Indictment and proved at trial: "It was part of the drug conspiracy that the Unknown Vice Lords (UVL) street gang would defend its drug territory against other street gangs, and would have weapons available to defend its territory and drug trafficking activities."

Each of the offenses in this case was committed by Starnes while he was the leader "Four Star Imperial Elite" of the Unknown Vice Lords street gang in Clarksdale, Mississippi. The evidence at trial showed that Starnes directed the gang's drug operation. (Vol. 8, pp. 302, 310, 355). Under Starnes' leadership, the gang members protected UVL gang and drug territory ("turf") with weapons and violence. (Vol. 8, pp. 375-79). Led by Starnes, members of the gang distributed crack cocaine and marijuana from their headquarters, a small blue shotgun house known as "The Blue Spot." (Vol.

8, pp. 301-03, 349). "The Blue Spot" had a doorbell at the rear bathroom window, which was covered by a tinted film that let those in the bathroom see outside, but prevented those outside from seeing in. (Vol. 8, p. 302). Patrons would ring the doorbell, and Starnes or one of the other gang members would then sell crack cocaine and marijuana out of the back window. (Vol. 8, pp. 302, 363). Trial testimony established that the doorbell rang day and night, and photographs offered at trial showed a well-worn path to the rear window. (Vol. 8, pp. 302, 363).

Starnes and the UVLs used a fully automatic AR-15 rifle, as well as many other rifles and pistols, to protect the UVL drug operation and to carry out attacks on rival gangs. (Vol. 8, pp. 375-79; Vol. 11, pp. 951-62). Starnes also provided gang members with two-way radios so they could act as lookouts to warn of the approach of law enforcement officers or rival gang members. (Vol. 8, p. 368).

In 2002, Starnes had Freddie Paschal and his girlfriend, both drug users, move into the house to assist in the drug distribution. Paschal knew many potential drug customers and brought those customers with him. (Vol. 2, 301-302). Paschal and his girlfriend lived in the house for about 2½ months. The doorbell rang night and day during his stay. (Vol. II, 303). Paschal's job was to go to the back window and see what the customers wanted and who they wanted to see. (Vol 2, 303-04). Paschal would take orders for crack at the rear window and would let Starnes or Burks know when a customer asked for them. (Vol. 2, 304). Starnes gave Paschal orders about selling crack and paid Paschal in crack cocaine. (Vol II, 308-10).

Firearms were part of the UVL drug conspiracy. Weapons were available to retaliate against attacks on members of the UVL drug organization, to defend UVL gang territory, and to protect UVL drugs and drug proceeds against possible robberies. By having firearms available to retaliate against

attacks, the UVLs helped protect their members, their organization, and the activities of the UVLs, including drug trafficking.  One of the main rivals to the UVLs was the Mafia Insane Vice Lords street gang, and during 2001 and 2002, the UVLs possessed weapons and conducted armed attacks against rival gang members.  (Vol. 11, 954-961).  The availability of weapons and the armed attacks served to protect UVL members and the drug operation.  UVL weapons possession and violence were inherent to the continuation of the gang's drug operations.

On the night of September 25, 2001, Burks, the UVL Enforcer, was shot and wounded.  The UVLs believed the Mafia Insane Vice Lords carried out the attack. (Vol. 11, 953-954).  Starnes told the UVLs, "We're going to get some 'get back.'" (Vol. 11, 954).   Early the next morning, Starnes led a retaliatory attack.  (Vol. 11, 955-961).  Starnes and other UVL members, including Terrian Pate, Anthony Jones and Carlos Foxx, armed themselves with various weapons, including an AK rifle, a shotgun and handguns, and then they drove and parked near a house trailer in Clarksdale.  (Vol. 11, 954-959).  They approached the house trailer on foot, and, on Starnes' command, fired into it numerous times with pistols, the AK rifle, and the shotgun, wounding a man who was sleeping inside. (Vol. 11, 952-964).  After the attack, Starnes and the others fled from the scene, dropped off the rifle and shotgun at The Blue Spot, and picked up other firearms while the others kept the pistols they had used in the attack.  (Vol. 11,  961-962).

They went to the nearby Hicks motel where police investigating the shooting found Starnes and five other UVLs in a room with six handguns.  (Vol. 11, 963-965).  The six loaded weapons included three .45 caliber pistols, one .38 caliber pistol, and two 9 mm pistols.  One of the weapons had an obliterated serial number, and another had what was then a higher-capacity law-enforcement-

only magazine. The six weapons were described in count six of the Superseding Indictment. The other UVLs in the motel room with the weapons included Terrian Pate, Frederick Johnson, and Anthony Jones. (Vol. 11, 962-963). The retaliatory attack and the possession of the weapons at the motel following the attack served to protect the UVLs and allowed them to continue their activities, including drug trafficking.

On September 30, 2001, UVL member Robert Cochran, using a .45 caliber pistol, shot several times at several people who were riding by in a car. (Vol. 9, 501). Clarksdale police responding to the shooting attempted to stop a car driven by Starnes and occupied by two other men, including UVL member Terrian Pate. (Vol. 9, 503-504). Starnes refused to stop his car and was chased by the police until he crashed the car. (Vol. 9, 503-504). He then jumped out, attempted to escape on foot, and was captured. *Id.* In Starnes' car, police found seven weapons, including an AK-style 7.62 mm semi-automatic rifle, two Hi-point 9 mm rifles, a .20 gauge shotgun, a stolen .22 caliber rifle, a .22 caliber RG derringer, and a Hi-point 9 mm pistol. (Vol. 12, 1070-1082).

On January 30, 2002, members of the Mafia Insane Vice Lords shot and killed Terrian Pate of the UVLs, who had distributed drugs at 630 Lincoln, and they shot and wounded Starnes. (Vol. 9, 504-506). The shooting of UVL leader and the killing of a UVL member prompted the UVLs to take actions to retaliate and acquire additional weapons to defend themselves and their gang and drug territory. (Vol. 9, 506-509).

On January 31, 2002, the day after the attack, the UVL Enforcer, Claude Burks, directed a UVL member in Oxford, Mississippi, to provide him with weapons. (Vol. 12, 1112). That same day, the UVL member complied by purchasing a Hess .223 caliber semi-automatic rifle and ammunition at

Nationwide Guns in Oxford, Mississippi. (Vol. 12, 1113). The UVL member also purchased 7.62 x 39 mm ammunition, suitable for use in an SKS rifle. (Vol. 12, 1114). The UVL delivered the Hess .223 rifle and ammunition to Burks and Robert Cochran., along with a 12 gauge shotgun, which was equipped with a pistol grip, and 12 gauge shotgun shells. (Vol. 12, 1114).

That night, January 31, 2002, the UVLs retaliated for the killing of Pate and the shooting of Starnes. (Vol. 9, 506-510). Earlier in the evening, Burks and other UVL members met at the gang's headquarters, The Blue Spot and planned a retaliatory attack. (Vol. 9, 509-511). The group armed themselves and in the darkness they silently approached a house at 708 Iowa Street in Clarksdale. *Id.* The armed gang members positioned themselves around the house, and on command they blasted the house, shooting rifles, shotguns and pistols, firing into the house numerous times. *Id.* One of the weapons used in the attack was the fully automatic AR-15 rifle. (Vol. 9, 509). At the time of the attack, the Iowa Street house was occupied by a woman and two small children, all of whom escaped without injury. (Vol. 9, 511-512). During this period of increased gang violence, the UVLs also temporarily used a motel room in Clarksdale as a base of operations, and armed UVLs drove the streets of Clarksdale trying to catch rival gang members on foot. (Vol. 11, 962-963).

On February 3, 2002, the day of the funeral of UVL Terrian Pate, loaded weapons, including the fully automatic AR-15, were at the location of the UVL drug operation, 630 Lincoln, and were available to protect the UVLs and the UVL drug operation. (Vol. 10, 716-727). That day, while gang members were away for Pate's funeral, drug user Gloria Lewis broke into 630 Lincoln through the bathroom window and stole some crack cocaine and marijuana. (Vol. 9, 600, 622-624). She was interrupted by police responding to a burglary in progress call and was caught leaving the house with

crack cocaine and marijuana in her hand. *Id.* That same day, police executed a search warrant at 630

Lincoln and found evidence of the UVL drug operation, including crack cocaine and five weapons.

(Vol. 10, 716-727). The weapons included the fully automatic AR-15 rifle used in the attack at house

on Iowa Street. *Id.* The other weapons included an SKS 7.62 semi-automatic rifle; a .40 caliber

pistol, the Hess .223 caliber semi-automatic rifle, and the 12 gauge shotgun with a pistol grip Burks

and Cochran had obtained January 31, 2002. *Id.* Ballistics tests linked at least one of these weapons

with the expended shell casings found at the January 31, 2002, UVL shooting attack at the house at

708 Iowa Street. (Vol. 11, 1001). The five weapons found in the UVL headquarters on February 3,

2002, were described in count five of the superseding indictment. During the search at 630 Lincoln,

officers also found ammunition, two ski masks, photographs of Starnes and Burks, UVL gang

documents, and documents reflecting that Starnes and Burks were using 630 Lincoln as their home

address. (Vol. 10, 692-740).

On June 12, 2002, federal, state, and local law enforcement officers executed a search warrant

at 630 Lincoln and found Starnes, Burks, and Robert Cochran inside with approximately 166 bags of

marijuana piled on a coffee table. (Vol. , 202-204). Inside The Blue Spot, Agents also found evidence

of the crack distribution operation, including crack cocaine and numerous small ziplock bags

containing crack cocaine residue. (Vol. 8, 211-12, 218). A plastic bag containing crack cocaine was

found on top of the toilet below the bathroom window where the drug sales were usually made. (Vol.

8, 219). Scales, binoculars, two boxes of ammunition, and a two-way radio were found in the house.

(Vol. 8, 211-215). Documents found at the house indicated that the UVLs were searching the internet

for bullet-proof vests and night vision goggles. (Vol. 8, 257-259). Agents also found UVL gang

documents, including lists of attendees at meetings and papers consisting of signed UVL oaths taken by new members. (Vol. 8, 228-257).

After receiving Miranda warnings, Robert Cochran said that Starnes and Burks had been packaging the marijuana. (Vol. 9, 528). Cochran also said that he had seen Starnes and Burks package and distribute narcotics on numerous occasions, that Starnes was obtaining the marijuana and cocaine from Don Thomas. (Vol. 9, 464). He said that gang members used the doorbell beside the back window to alert Starnes and Burks when someone was there to purchase drugs. (Vol. 9, 461). He said the walkie-talkies were used to keep in contact with lookouts on the street. (Vol. 9, 490-491). Cochran stated that the house belonged to Starnes, but he furnished narcotics to drug users in exchange for keeping the utilities in their names. (Vol. 9, 550).

The evidence introduced at trial included a video tape made by agents on June 12, 2002 during execution of the search warrant, which showed the manner in which the UVLs had set up the house at 630 Lincoln to serve as their drug distribution location. (Vol. 7, 184-187). On one occasion, Starnes expanded the UVL gang and drug territory by leading a group of armed UVLs to confront another street gang and take over part of their territory. (Vol. 7, 373-380; Vol. 8, 473-481). That day, Starnes gathered UVL members at the blue spot and distributed weapons to UVL members. *Id.* Starnes led the group to the 600 block of Grant Street, which was Conservative Vice Lords (CVL) territory. *Id.* There, Starnes and the UVLs confronted several CVL members, brandished their weapons, and forced the CVLs to leave. (Vol. 7, 373-380; Vol. 8, 473-481). Michael Starnes later expanded the UVL drug operation from the Blue Spot to new territory, using a house and an apartment on the 600 block of

Grant Street.  (Vol. 9, 548-549).  He instructed Burks and Cochran to use the house for distributing drugs, while Starnes was to use the apartment.  (Vol. 9, 549-550).

## Analysis of Starnes' Claims

As set forth above, in the instant § 2255 motion, Starnes makes several claims in challenging his conviction and sentence.  All of the claims are based upon a theory of ineffective assistance of counsel, and all are without substantive merit.

## The 30 Year Sentence Imposed for Count Five

Starnes contends that his counsel was ineffective for failing to object to the 30-year sentence he received on count five for possession of a machine gun in the furtherance of a drug trafficking offense because the jury never determined beyond a reasonable doubt that he possessed a machine gun.  Starnes received the 30-year sentence for his conviction on count five, which charged possession of firearms on February 3, 2005, in furtherance of a drug trafficking offense, a violation of 18 U.S.C. 924(c)(1).  Count five described five firearms including "a machine gun, a Colt AR-15 .223 caliber semi-automatic assault rifle which would fire fully automatically."

Count five charged:

[T]hat "on or about February 3, 2002, in the Northern District of Mississippi, MICHAEL STARNES, aka "Little Mike," CLAUDE BURKS, and ROBERT COCHRAN, JR., aka "Rob," defendants herein, did knowingly and intentionally possession firearms,

a.  a machine gun, a Colt AR-15 .223 caliber semi-automatic assault rifle which would fire fully automatically;
b.  a Hess .223 caliber semi-automatic rifle;
c.  a SKS 7.62 x 39 mm caliber semi-automatic rifle;
d.  a Mossberg 12 gauge shotgun; and

e.      a Hi Point .40 caliber semi-automatic handgun,

in furtherance of a drug trafficking crime, possession with intent to distribute cocaine based, crack cocaine, as charged in Count Three, a conspiracy to possess with intent to distribute controlled substances as charged in Counts One and Two of this Superseding Indictment, that is, the defendants had accessible said firearms to provide a defense against anyone who might attempt to rob them of their drugs or drug profits, to retaliate against attacks on members of the Unknown Vice Lords, aka "UVL" drug organization and to defend UVL drug trafficking territory, or "turf," all in violation of 18 U.S.C. 924(c)(1).

The Court instructed the jury to determine whether Starnes possessed "a firearm" in furtherance of a drug trafficking crime. Starnes was convicted, and the court treated the fact that the firearm was a machine gun as a sentencing factor determined by the court. Starnes argues that his counsel should have objected to the 30-year sentence on grounds that it was a violation of the Supreme Court's decision in *Castillo v. United States*, 539 U.S. 120 (2000), which held that under 924(c)(1) a machine gun is an element of the crime rather than a sentencing factor.

Castillo, however, was not applicable to the version of 924(c)(1) under which Starnes was sentenced. Prior to *Castillo*, the Fifth Circuit had held that the fact of a machine gun was a sentencing factor under the previous version of 924(c)(1). *United States v. Gonzales*, 121 F.3d 928, 941 (5th Cir. 1997); *United States v. Branch*, 91 F.3d 699, 738-40 (5th Cir. 1996), *cert. denied*, 520 U.S. 1185 (1997). In *Castillo*, the Supreme Court analyzed a prior version of § 924(c)(1) and determined that the wording created offense elements rather than sentencing factors. *United States v. Barton*, 257 F.3d 433, 442 (5th Cir. 2001). Starnes was convicted under the later version of 924(c)(1), however, and it wasn't until 2010, using the later version of 924(c)(1) – the version under which Starnes was convicted and sentenced – that the Supreme Court held that a machine gun was an element of the offense rather than a sentencing factor.

- 12 -

*United States v. O'Brien*, 130 S.Ct 2169 (2010). Following O'Brien, the Fifth Circuit recognized that the fact of a machine gun was an element of the offense under 824(c)(1). *United States v. Gonzales*, 121 F.3d 928, 935 (5th Cir. 1997), *abrogated by United States v. O'Brien*, 130 S.Ct 2169 (2010), as noted in *United States* v. *Johnson*, 398 Fed. Appx. 964 (5th Cir. 2010)(*per curiam*) (unpublished). Starnes was convicted in 2004, some six years before the Supreme Court's ruling in *O'Brien*. Trial counsel cannot be faulted for failing to anticipate a change in the law occurring six years *after* judgment. Counsel is not required to anticipate changes in the law. *United States v. Fields*, 565 F.3d 290, 295-97 (5th Cir. 2009).

Starnes also argues that the jury could have found him guilty of any of the five firearms charged in count five based on the jury instructions, and therefore he should have been sentenced for the firearm in count five which carried the least penalty, a five year sentence. This claim is likewise without merit. Starnes was charged with possessing a "firearm." As discussed above, under law existing at the time of sentencing, the use of a machine gun was considered a factor for sentencing, not an element of the offense. Thus, no matter which firearm the jury might have found Starnes to possess, the evidence at trial was overwhelming that Starnes possessed the fully automatic AR-15 rifle, which constitutes a "machinegun" under 18 U.S.C. 924(c)(1). Certainly the evidence presented exceeded the preponderance standard, and this claim for relief is without merit and will be denied.

## Leadership Role

Starnes next contends that his counsel was ineffective for failing to object to the four level enhancement under USSG 3B1.1(a) that Starnes received for his leadership role in the

offense.  This claim is wholly without merit based upon the overwhelming evidence that Starnes was the sole leader of the Unknown Vice Lords.  Counsel had no basis upon which to object to an enhancement for a leadership role.  Section 3B1.1(a) provides for a four-level increase to the total offense level of a defendant who "was an organizer or leader of a criminal activity that involved five or more participants."  When counting "five or more participants" requirement under 3B1.1(a), the defendant, himself, may be counted as one of the five.  *United States v. Barbontin*, 907 F.2d 1494, 1498 (5th Cir. 1990).  A participant is a person who is criminally responsible for the commission of the offense, even if not convicted.  *United States v. Curtis*, 635 F.3d 704, 720 n.57 (5th Cir. 2011); USSG 3B1.1 commentary n. 1 (2010).  "The defendant need not have supervised each and every coconspirator:  'Proof that the defendant supervised only one other culpable participant is sufficient to make the defendant eligible for the enhancement.'" *United States v. Curtis*, 635 F.3d at 720, *quoting United States v. Cooper*, 274 F.3d 230, 247 (5th Cir. 2001); U*nited States v. Okoli*, 20 F.3d 615, 616 (5th Cir. 1994).

The trial court heard evidence and was satisfied by a preponderance of that evidence, direct and circumstantial, that the drug conspiracy involved five or more participants – and that Starnes was a leader of the drug activity.  Starnes supplied the crack cocaine and the marijuana for the drug distribution drug operation.  Those distributing drugs included Starnes, Claude Burks, Robert Cochran, Freddie Paschal, and Terrian Pate; those serving as lookouts for the drug operation included Michael Cochran and Mark Young, (VII 368; VIII 489-90).

The Unknown Vice Lords used violence to protect and expand their drug turf.  Starnes was the undisputed head of the Unknown Vice Lords.  Under his leadership, the gang distributed

drugs in its territory and used firearms and violence to protect and expand its territory. The UVL drug distribution was based at Starnes' residence, 630 Lincoln Place, Clarksdale, which also served as UVL headquarters. Starnes and the Unknown Vice Lords distributed drugs to customers in UVL territory, and other gangs and dealers were prohibited, upon threat of violence, to come into UVL territory and sell drugs. (VIII 473). There are other examples of Starnes' leadership of the Unknown Vice Lords too numerous to mention. The government details many of them in its response to the instant motion.

Witness after witness testified that Starnes was the leader of the Unknown Vice Lords. He made all major decisions – and most of the minor ones. He signed nearly every document memorializing the entrance of new members. The government easily proved Starnes' leadership role beyond reasonable doubt, far in excess of the mere preponderance standard used for determining sentencing factors. Starnes' attorney was reasonable in his decision not to raise such a frivolous argument, and this claim for relief is also without merit.

## Obstruction of Justice Enhancement

Starnes next contends that his counsel was ineffective for failing to object to the two-level enhancement he received for objection of justice. Trial testimony clearly established Starnes' obstruction, and there is no merit to this claim. The Presentence Investigation Report, Offense Conduct, para 36, stated: "Robert Cochran testified at the Starnes trial that Michael Starnes told him to abscond to avoid arrest. Cochran also agreed with the factual basis that he remained a fugitive for approximately eight months before finally being captured in Minnesota. Cochran testified that Michael Starnes instructed him to tell the Clarksdale police officers

- 15 -

involved in seizing marijuana from 630 Lincoln Place on June 12, 2002, that the marijuana belonged to Fred Paschal. The trial testimony established marijuana was part of the UVL drug distribution conspiracy." PSR, para 36.

Starnes argues that Robert Cochran's testimony is not credible. The trial court, however, had ample opportunity to hear Cochran's testimony on this and other matters and assess his credibility on direct and cross examination. Starnes argues that his counsel could have shown: (1) that Starnes had not told Cochran to flee because Starnes would not have known if Cochran had money to flee, (2) that there was no evidence that Starnes tried to influence the testimony or activities of any other gang members, (3) that Starnes wanted Cochran to be a witness for him, (4) that Starnes was in custody and had no influence he could exert on anyone, and (5) that, from the time Cochran was indicted on January 25, 2002 until he ran in February 2003, he was in and around Clarksdale and could and should have been arrested. Starnes' arguments are pure speculation and without merit. The trial court heard sufficient testimony to find by a preponderance of the evidence that Starnes obstructed justice. Starnes' counsel had no basis to object to the sufficiency of the evidence to establish obstruction of justice. As such, his decision not to object on that basis was reasonable, and he provided effective assistance to Starnes. This claim is without merit.

## Criminal History Points

Starnes next contends counsel was ineffective for failing to object to the exclusion of Starnes' two prior marijuana convictions as relevant conduct for Count Two of the Superseding Indictment. He asserts that the two prior convictions should have been considered relevant

conduct to the marijuana conspiracy rather than as separate offenses in calculating his criminal history category, which placed him in criminal history category II.  Under USSG 4A1.1, a defendant receives criminal history points for each prior sentence.  "The term 'prior sentence' means any sentence previously imposed . . . for conduct not part of the instant offense."  USSG A1.2(a)(1).  If the prior conduct is part of the instant offense, it is instead treated as relevant conduct and is considered in the calculation of the defendant's offense level, not criminal history category.  *See* USSG 1B1.3(a).  Conduct that is part of the instant offense is further defined as "relevant conduct to instant offense the under the provisions of Section 1B1.3." USSG 4A1.2, comment n. 1. Section 1B1.3, in turn, provides that relevant conduct includes acts that were "part of the same course of conduct or common scheme or plan as the offense of conviction."  *See United States v. Thomas*, 53 F.3d 73, 83 (5th Cir. 1995).

"Common scheme or plan" is defined as two or more offenses that are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.*; USSG 1.B1.3 application note 9(A).  "Same course of conduct" is defined as follows:  "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  1B1.3 application note 9(B).  Factors to  consider in making this determination include "the degree of similarity of the offense, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* "When

one of the above factors is absent a stronger presence of at least one of the other factors is required." *Id.*

The PSR accorded Starnes one criminal history point, under 4A1.1(c), for each for two prior convictions, for a total of two criminal history points, which placed him in criminal history category II. PSR, paras. 66-74. Starnes was arrested March 6, 2001 for "Possession of Marijuana, 1 Offense," and on September 13, 2001, he pled Nolo Contendere in city court, was found guilty and fined $201. PSR, para. 66. Starnes was arrested September 30, 2001 for "Drug Violation-misdemeanor," and on October 9, 2001, he pled Nolo Contendere in city court; was found guilty, and sentenced to 45 days custody and a $400 fine. PSR, para 67. There was no indication as to the type of drug involved, but the sentence was consistent with simple possession of marijuana.

Starnes' convictions for possession of marijuana and the misdemeanor drug offense are consistent possessing a small amount of drugs for personal use. In contrast, the instant conspiracy (count two) involved a long-term, well-planned, and organized drug operation involving UVL gang members, UVL territory, organized crack and marijuana distribution at UVL headquarters with a walk-up service window and buzzer for drug customers, UVL members waiting on customers, and the use of lookouts, firearms and violence to protect the operation.

The prior possession conduct and the later conspiracy did not substantially share "common victims, common accomplices, common purpose, or similar *modis operandi*," and therefore they were not part of a common plan or scheme. Nor did they qualify as part of the

"same course of conduct" because they were not "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." 1B1.3 application note 9(B). Although both offenses involved marijuana, there was no "degree of similarity" between the simple possession of a user amount and a highly organized drug distribution conspiracy. The lack of similarity between the prior offenses and the in offense means that "a stronger presence of at least one of the other factors is required," the regularity (repetitions) of the offenses, and the time interval between the offenses." Starnes has not established a stronger presence of either factor sufficient to overcome the lack of similarity between the instant offense and the prior offenses. *See United States v. Davidson*, 195 F.3d 402, 409 (8th Cir. 1999) (possession convictions were not relevant conduct to a conspiracy offense where the acts were separated by almost two months, and there was not common plan or victim.) Further, there is no evidence that the prior offenses occurred in preparation for the federal offense, or in the course of attempting to avoid detection for the federal offenses. *See* USSG 1B1.3(a)(1). The prior convictions and instant offense are distinct. Starnes has not shown that the court erred in treating them as prior convictions rather than as relevant conduct, and Starnes' counsel was not deficient for failing to raise a meritless objection.

### Counsel's Decision Not to Call Various Witnesses

"The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances." *Id*. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining

counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. As such, the court engages in a "strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 690. (internal quotation marks omitted).

Starnes' claims regarding the propriety of counsel's decision not to call certain witnesses are speculative at best, and they border on frivolous. A "defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). "[B]are allegations do not suffice." *Id.*; *see also United States v. Farr*, 297 F.3d 651, 658-59 (7th Cir. 2002). "[W]hile a lawyer's failure to investigate a witness who has been identified as crucial may indicate an inadequate investigation, the failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance." *United States v. Cockrell*, 720 F.2d 1423, 1428 (5th Cir. 1983).

Trial counsel's decision regarding "whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 291 F.3d 192, 201 (2nd Cir. 2000) (internal quotation marks omitted). *See Seymour v. Walker*, 224 F.3d 542, 556 (6th Cir. 2000) ("To consider Seymour's counsel defective for failing to call [defendant's sister, a witness likely considered

biased] to testify would be to engage in precisely the kind of second-guessing of trial strategy that the Supreme Court strongly discouraged in *Strickland*.").

In his 2255 motion, Starnes describes the testimony that he claims the witnesses could have provided. Starnes claims that his mother, Earnestine Harris, could have refuted the claims that Starnes stored drugs and money at her house. However, there was no testimony that Starnes stored drugs at her house with her knowledge; thus it would not have negated the possibility that he would sometimes store drugs or money there without her knowledge. As crack cocaine and money could be easily concealed either inside or outside a house, this argument is unavailing. In addition, a jury may well have considered Starnes' mother a biased witness and discounted her testimony. Finally, his mother's awareness that he sometimes stored drugs at her house had little to do with the central core of the case against Starnes: his involvement in the drug distribution operation at his residence, 630 Lincoln Place, and his leadership of the UVL gang and drug distribution operation.

According to Starnes, Stephanie Foxx, the mother of ULV member Carlos Foxx, would have testified that she was a drug addict, had often gone to 630 Lincoln Place to buy drugs, but had never bought any drugs from Starnes. This purported testimony would not have contradicted evidence of Starnes' involvement and leadership of the drug operation as detailed by his co-conspirators, as the sales at Starnes residence through the rear bathroom window were made by Starnes and others, including Terrian Pate, Claude Burks, Robert Cochran and Freddie Paschal. A customer could make numerous drug purchases without being personally served by the Starnes. The testimony would not have exculpated Starnes, but would have supported the

government's evidence that 630 Lincoln, Starnes' residence, UVL headquarters, was the center of UVL drug distribution.

Sherica Jackson is the mother of Starnes' son.  According to Starnes, his child's mother would testify that he had never stored or handled drugs or firearms at her apartment, and that he was never violent or abusive to her or their son.  Her testimony would have had little or no impact on the case, which centered on the distribution operation at Starnes' residence, not on any drug activity at Jackson's apartment.  In addition, Starnes  is the father of Jackson's child, and the jury may well have considered her testimony biased.  Although Jackson would purportedly claim that Starnes was never violent, a cross examination of her would have painted a decidedly different picture.  Starnes beat a man nearly to death with a baseball bat while Jackson repeatedly kicked him.  When the police arrived, the unconscious victim was injured so badly that he was taken to the Med in Memphis. (Transcript of Starnes sentencing hearing, Sept. 7, 2007, pp 21-22).  Thus, as Jackson, herself, joined Starnes in a brutal and potentially fatal beating, she was hardly in a position to vouch for Starnes' peaceful nature.

Starnes cites Claude Burks as another potential witness.  Starnes claims that Burks told Starnes' attorney that Starnes did not know about the AR-15 until the day of Terrian Pate's funeral; that Starnes did not own the AR-15; and that to Burks' knowledge, Starnes had not sold any drugs from the house at 630 Lincoln.  This proposed testimony was contradicted by Robert Cochran – who testified at trial that he and Burks were present at 630 Lincoln when Starnes purchased the AR-15 for $600 from Lee Myles.  The AR-15 was later seized at Starnes' residence.  In weighing whether to call Burks to testify, counsel could have taken into account

Burks' claim that Starnes had not sold any drugs from the house at 630 Lincoln.  This claim was so thoroughly contradicted by the testimony of Starnes' co-conspirators that it would have undermined Burks' credibility about the AR-15.  Additionally, Burks' claim that "to his knowledge" Starnes had not sold any drugs at 630 Lincoln, would have been of little use to the jury because it was possible for Starnes to sell drugs at the Blue Spot with Burks' having seen him.  Burks,  who was Starnes' co-defendant and UVL Enforcer, had entered into a plea agreement prior to trial and he did not testify for either side.  Perhaps after talking to Starnes' counsel, Burks did not want to testify – had changed his story – or did not want to subject himself to possible criminal exposure for perjury.  Cross examination of Burks would have included confronting him with the abundance of testimony and documents conclusively establishing Starnes as the leader of marijuana and crack cocaine conspiracies, including the video recording of the execution of the search warrant at 630 Lincoln on June 12 – when Starnes and Burks were caught bagging up marijuana into numerous packets for distribution.  Denial of Starnes' involvement would have been futile in light of the devastating evidence otherwise, and the cross examination would have reminded the jury of the government's case through reiteration of the UVL distribution operation and Starnes' involvement and leadership and the details of armed patrols and retaliatory attacks, including two attacks in which the fully automatic AR-15 was fired.

According  to Starnes, Ricky Thomas would have testified that Starnes did not purchase the AR-15 machine gun, because Robert Cochran owned the AR-15 and often bragged about ownership of the gun.  Thomas' purported testimony was contradicted by Robert Cochran, an

admitted member of the UVL street gangs and co-conspirator of Starnes, who testified that he was present when Starnes when Starnes purchased the AR-15 machine gun from Lee Myles for $600. (Vol. 8, 519-523).  Cochran also admitted that the machine gun was kept at 630 Lincoln (Starnes' residence), where it was subsequently seized by police.  (Vol. 8, 522).  If Thomas had testified as Starnes claims, his testimony that Cochran "owned" the AR-15 would not have absolved Starnes of the offense of "possession" of the AR-15 machine gun (Count Four) – because ownership is not an element of the offense.  Nor would Thomas' testimony have exonerated Starnes of the offense of possession of the machine gun in furtherance of a drug trafficking crime (Count Five), as ownership was not an element of that offense.  The jury was instructed that possession can be actual or constructive and may be sole or joint; thus, even if Cochran "owned" the machine gun, his ownership did not preclude Starnes' possession in furtherance of drug trafficking.

According to Starnes, Thomas would also testify that he had never seen Starnes selling drugs at 630 Lincoln.  Thomas was not alleged to be one of the UVLs involved in selling drugs at 630 Lincoln and thus his purported testimony that he had never seen Starnes selling drugs at that location would have been less significant than the testimony of others who were directly involved in the distribution and who testified about Starnes' involvement and direction of the drug operation.  For example, Freddie Paschal testified that Starnes had Paschal and his girlfriend move into 630 Lincoln to sell drugs for Starnes, which they did for about 2½ months.  Considering that the drug sales at 630 Lincoln were made through the rear bathroom window to customers who buzzed for service, Thomas would likely have not been present in the bathroom

at times when Starnes, or others, responded to the buzzer and went into the bathroom to distribute drugs.

There is no evidence that the outcome would have been different if trial counsel called the proposed witnesses. They were easily impeachable or could have been considered biased by the jury. Cross examination could have helped the government's case by reminding the jury of the details of Starnes' involvement and leadership of the gang and distribution operation and the violence involved in protecting the operation. Instead of using such witnesses, counsel reasonably focused the bulk of his efforts on emphasizing that each government witness was a criminal and drug dealer with everything to gain from fabricating testimony. Counsel clearly chose the time-tested strategy of presenting no evidence in hopes that the jury would infer the government's case merits no response. Certainly counsel's reference to the government's case as "a garbage truck" during closing arguments suggests that approach. Calling weak witnesses would have undermined counsel's chosen strategy.

Trial counsel's decision as to "whether to call specific witnesses - even ones that might offer exculpatory evidence - is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 291 F.3d 192, 201 (2nd Cir. 2000) ("[C]ounsel's decision as to whether to call specific witnesses - even ones that might offer exculpatory evidence - is ordinarily not viewed as a lapse in professional representation.") (internal quotation marks omitted). *See Seymour v. Walker*, 224 F.3d 542, 556 (6th Cir. 2000) ("To consider Seymour's counsel defective for failing to call [defendant's sister, a witness likely considered biased] to testify would be to

engage in precisely the kind of second-guessing of trial strategy that the Supreme Court strongly discouraged in *Strickland*.").

## Drug Amount Attributed to Starnes for Relevant Conduct

Starnes next contends that his counsel was ineffective because he did not challenge the district court's drug quantity calculation in his appeal to the Fifth Circuit. Starnes' counsel did object to the quantity calculation in the PSR and at sentencing. The objection was overruled. The objection was based on attacking the credibility of William Harper, a member of the UVLs a co-conspirator of Starnes, whose trial testimony was used to attribute one kilogram of crack cocaine to Starnes.  In his objection to the PSR, counsel stated:

> Defendant objects to the use of one kilogram being used against him for sentencing guidelines purposes as is alleged in paragraph thirty-seven [of the PSR].  The only proof presented at trial for the existence of this alleged one kilogram is the unsupported testimony of William Harper As note above Harper' testimony was thoroughly discredited at trial.  Both the amounts of contraband actually found at 630 Lincoln, as well as the fact that no large sums of money were recovered or even alleged to be present weighs heavily against the believability of Harper's testimony regarding one kilogram of cocaine base….

(Defendant's Objections to the PSR, para 19, pp 5-6)

At the sentencing hearing, counsel again pursued his objections and contended that the testimony as to quantities was not credible.  (Transcript of First Sentencing, January 8, 2004, pp. 11-12).  Noting that it was a credibility issue, the district court overruled this and other objections to the PSR. (*Id*. at 12-14).  The district court must determine the quantity of drugs attributable to a defendant by a preponderance of the evidence.  The evidence before the court, including the trial testimony and the PSR, provided sufficiently reliable information of the

district court's calculations as to drug quantity.  Because the drug quantity was based on trial testimony and the credibility of witnesses, counsel could have reasonably believed that raising the issue on appeal would have been fruitless. Counsel could also have reasonably believed that raising the issue could have undermined or weakened his credibility in pursuing other, meritorious, issues on appeal.

**Double Jeopardy**

Starnes claims that charging and sentencing him on separate crack cocaine and marijuana conspiracies amounted to double jeopardy and that his counsel was deficient for failing to raise the issue on appeal.  There is no merit to this claim.  The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." *U.S. Const. Amend V*.  This clause prevents the government from charging a single offense in multiple counts of an indictment (multiplicity of indictment) and, from seeking multiple sentences for the same offense (multiplicity in sentencing).  "'The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense.'" *United States v. Reedy,* 304 F.3d 358, 363 (5th Cir. 2002) (quoting *United States v. Swaim,* 757 F.2d 1530, 1537 (5th Cir.1985)).  When overlapping statutory provisions create the risk of multiplicity, "'the test for determining whether the same act or transaction constitutes two offenses or only one is whether conviction under each statutory provision requires proof of an additional fact which the other does not.'"  *Id.* (quoting *United States v. Nguyen,* 28 F.3d 477, 482 (5th Cir.1994).  This test was first announced in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182 (1932).  The Supreme Court

added that a determination of multiplicity "cannot be resolved without determining what punishments the Legislative Branch authorized." *Whalen v. United States,* 445 U.S. 684, 688, 100 S.Ct. 1432, 1436 (1980).

The test to determine whether counts are multiplicitous is "whether each provision requires proof of an additional fact which the other does not." *United States v. Martinez-Espinosa,* 299 F.3d 414, 417 (5th Cir.2002); *see also United States v. Phipps,* 319 F.3d 177, 184 (5th Cir.2003). Here, each of the two convictions required the government to prove an additional fact: Count One required the government to prove that Starnes was a member of a conspiracy to distribute crack cocaine, while Count Two required the government to prove that Starnes was a member of a conspiracy to distribute marijuana. The *Blockburger* test, then, reveals that the counts as charged do not violate the Double Jeopardy Clause. While the time periods for the conspiracies are the same and participants overlapped, additional conspirators were involved in each conspiracy, and the primary locations of distribution in each conspiracy differed. The crack cocaine conspirators included two suppliers, Don Thomas and Twin Powell. Thomas and Powell supplied the cocaine to Starnes that was distributed in the crack distribution operation. (Vol III, 464). The marijuana conspirators included two other suppliers, "Cha Cha" Powell and "Aaron." (Vol. 9, 467-68).

Some conspirators had different roles as to crack cocaine and marijuana distribution. For example, Claude Burks and Robert Cochran primarily concentrated on selling marijuana, although they also sold crack. (Vol. 9, 470-71). And Michael Starnes and Terrian Pate primarily concentrated on selling crack cocaine. *Id.* Crack cocaine was primarily sold at the UVL

headquarters, 630 Lincoln, known as "The Blue Spot," which was also Starnes' residence, while the marijuana was primarily sold on the streets in the UVL territory. (Vol. 9, 472). This final claim is without merit and will be denied.

### Conclusion

In sum, none of Michael Starnes' claims under 28 U.S.C. § 2255 has merit, and the instant motion to vacate, set aside, or correct his sentence will be denied. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 31st day of March, 2014.

**/s/ MICHAEL P. MILLS**_____
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**